UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


<u>Lori Bergeron</u>

    **v.**                     Case No. 11-cv-395-PB
                                  Opinion No. 2012 DNH 102

<u>Michael J. Astrue, Commissioner</u>
<u>Social Security Administration</u>


<u>MEMORANDUM AND ORDER</u>

Lori Bergeron seeks judicial review of a decision by the Commissioner of the Social Security Administration denying her applications for disability insurance and supplemental security income benefits. Bergeron contends that the Administrative Law Judge ("ALJ") who considered her application made a number of errors in determining that she retained a residual functional capacity ("RFC") for sedentary work. For the reasons provided below, I affirm the Commissioner's decision.


I.   <u>BACKGROUND</u>[1]

Bergeron applied for disability insurance and supplemental security income benefits on July 28, 2006, when she was twenty-eight years old. She alleged a disability onset date of June 1,

---

[1] The background information is taken from the parties' Joint Statement of Material Facts. <u>See</u> L.R. 9.1(b). Citations to the Administrative Transcript are indicated by "Tr."

2006, due to an open compound fracture of her right tibia and fibula, panic disorder, and bipolar disorder. She finished high school and attended some college. In the past she worked as a waitress, a secretary, and a manager/bookkeeper.

## A. **Administrative Proceedings**

After Bergeron's applications were denied at the initial levels, she requested a hearing before an ALJ. Following a hearing, the ALJ issued an unfavorable decision in October 2008. Bergeron sought judicial review, and in November 2009, this court reversed and remanded the ALJ's decision because the ALJ failed to explain the consideration she gave to the medical opinion of Bergeron's primary care provider. See Bergeron v. Astrue, Civ. No. 09-cv-070-SM, 2009 WL 3807156 (D.N.H. Nov. 10, 2009).

A new hearing was held before the same ALJ on March 28, 2011. The ALJ issued an unfavorable decision on April 13, 2011. At step two of the sequential analysis, the ALJ found that Bergeron suffered from "right leg deformity, status post tibia fracture," and that the condition was a severe impairment. At step three, however, the ALJ found that Bergeron did not have an impairment or combination of impairments that met or medically equaled a listing. The ALJ went on to find that Bergeron retained the RFC to perform sedentary work involving only occasional climbing, balancing, stooping, kneeling, crouching,

or crawling.  At step four, she concluded that Bergeron was capable of performing her past relevant work as a secretary. Accordingly, the ALJ found that she was not disabled from June 1, 2006, through the date of the decision.  Bergeron again filed for judicial review.

**B.    Relevant Medical Evidence**[2]

Prior to her alleged onset date, Bergeron's primary care physician, Dr. John Ford, treated her for chronic pain with methadone.  Dr. Ford attempted to have her taper off methadone, but continued to prescribe it when Bergeron did not tolerate the attempted wean.  Dr. Ford referred Bergeron to a physician more experienced in handling chronic methadone use, but it is not clear from the record whether Bergeron met with this physician.

On June 1, 2006, the alleged disability onset date, Bergeron was involved in a motor vehicle accident as the driver of a car that went across the midline and struck an oncoming car.  A physician at the Androscoggin Valley Hospital assessed that Bergeron suffered multiple trauma, including four fractured ribs, bilateral lung contusions, a fractured left sacrum, a fractured left anterior pubic ramus, a fractured left L5 transverse process, an open compound fracture of the right tibia

---

[2] Because Bergeron only challenges the ALJ's physical RFC assessment, I need not recount her mental health treatment records and evaluations.

and fibula, and probable renal contusion.  The physician noted that Bergeron had lost consciousness, but that a CT scan of the head revealed no structural abnormalities.

Bergeron was then transferred to the Dartmouth-Hitchcock Medical Center, where she underwent surgery to repair the open compound fracture of her right tibia and fibula and to remove intra-abdominal fluid.  She was discharged from the hospital on June 5, 2006, with a splint on her right leg and prescriptions for oxycodone, methadone, and Neurontin.  Bergeron's discharge instructions specified that she should use touch-down weight-bearing only on her right leg.

Following her discharge, Bergeron received treatment for her fracture from Dr. Kenneth J. Koval of the Dartmouth-Hitchcock Medical Center.  An x-ray taken on June 21, 2006, showed that Bergeron's fracture lines still were quite apparent and that there was no evidence of significant union.  On July 19, an x-ray showed that Bergeron's tibia and fibula were unchanged.

Approximately two weeks later, Bergeron was admitted to the Dartmouth-Hitchcock Medical Center, where physicians noted that she had developed inflammation of the bone caused by infection in her fracture wound and that the skin overlying the fracture was necrotic, indicating cell death.  Bergeron underwent another surgery for irrigation and debridement of the wound; removal of

4

previously placed intramedullary fixation rod and screws; application of an external fixator to stabilize the fracture; irrigation, debridement, and replacement of antibiotic beads; and plastic surgery to her right leg with spilt skin graft.  She was discharged a week later with instructions not to bear weight on her right leg and to keep the leg elevated.

At a follow-up visit on August 14, Dr. Koval noted that Bergeron's external fixator was intact, her pin sites were clean, her skin graft appeared viable without significant drainage, and her surgical wounds were well-healed.  Bergeron reported that her pain was relatively well-controlled.  Dr. Christopher P. Demas, the physician who had performed Bergeron's skin graft, noted that the graft was 100% "take" and looked perfect, with no evidence of infection, seroma, or hematoma. Dr. Koval placed Bergeron's ankle in a posterior splint and instructed her to remain non-weight-bearing until her next x-ray in two weeks.  He noted that he had discussed with Bergeron that she might need a bone graft for the fracture to fully heal.

On August 24, 2006, Dr. Patrick R. Olson noted that Bergeron's external fixator was intact, her pin sites were clean, her surgical wounds were well-healed, and her skin graft was intact.  Bergeron reported that her main symptom was pain in her leg.  Dr. Olson urged Bergeron to quit smoking, as it could prevent bone healing, and instructed her to continue to remain

non-weight-bearing.  An x-ray revealed that Bergeron's fracture was unchanged.  On the same date, Dr. Demas noted that Bergeron's skin graft was 90% healed.  Bergeron requested narcotics for pain, but Dr. Demas felt that she no longer required narcotics for her skin graft.  He advised Bergeron to apply moisturizer to the area.

The following day, Bergeron met with Dr. Gilbert J. Fanciullo to discuss pain medication.  Dr. Fanciullo noted Bergeron's remote history of heroin abuse and advised her that he would not prescribe oxycodone.  Dr. Fanciullo did agree to prescribe methadone and hydromorphone as needed while the external fixator remained in Bergeron's leg, but stated that he would wean her off of all opioids after removal of the device. Dr. Fanciullo noted that it would be appropriate for Dr. Ford to continue to prescribe methadone for Bergeron's lower back pain after that point.

An x-ray taken on September 5, 2006, showed that Bergeron's fracture lines remained visible and that extensive soft tissue deformities were present.  On September 14, Dr. Jose-Mario Fontanilla noted that Bergeron's delayed bone healing was indicative of ongoing infection, and that Bergeron might need a bone graft.  On that same date, Dr. Demas noted that Bergeron's skin graft was essentially totally healed and released her from active follow-up.

On September 29, Dr. Olson noted that Bergeron appeared obviously distressed.  She reported falling and hitting her external fixator, resulting in severe pain in her tibia.  Dr. Olson determined that the external fixator was intact and aligned.  An x-ray revealed no change in alignment.  He assessed, however, that Bergeron needed a bone graft.

In October, state agency physician Dr. Joseph Cataldo reviewed Bergeron's medical records and evaluated her tibia fracture.  Dr. Cataldo opined that Bergeron could lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and engage in unlimited pushing and pulling.  He further opined that Bergeron could climb, balance, stoop, kneel, crouch, and crawl only occasionally.

On October 12, Dr. Billy W. McGough, Jr. noted that Bergeron was showing signs of tibial nonunion and informed her that she would receive a bone graft sometime in the following weeks.  The bone graft procedure took place on November 29.  Bergeron was released the following day after an overnight stay at the hospital for pain control and observation.

At a follow-up appointment on December 12, Dr. Koval noted that Bergeron's pin sites were clean and dry and that her leg

was in good alignment.  An x-ray showed that Bergeron's fracture and hardware were in adequate position.

On January 23, 2007, Dr. Koval again noted that Bergeron's pin sites were clean and dry, with a minimal amount of drainage from her most distal pin site.  An x-ray showed increased opacity around the fracture site, indicating that the bone was healing.  Bergeron's fracture line was still visible but less so than in previous x-rays.  Dr. Koval noted that Bergeron was bearing weight as tolerated with some pain at the fracture site and advised her to continue to bear weight as tolerated.

At a follow-up appointment in March 2007, Dr. Koval noted that an x-ray showed that the fracture was healing.  Bergeron's external fixator was removed and she was placed in a walking boot.  Dr. Koval advised her to bear weight on her right leg as tolerated.

On April 26, Dr. Koval noted that Bergeron was walking without the assistance of any devices but still had a limp.  Bergeron complained of a burning or nerve sensation around the fracture.  She was able to squat (though not fully) and jump up and down with some pain.  Bergeron had no pain when her leg was stressed.  An x-ray revealed that the fracture was healing and in adequate position.  Dr. Koval advised Bergeron to increase her activities and desensitize the fracture area by rubbing it with lotion.

On July 9, state agency orthopedic surgeon Dr. Avigdor I. Niv reviewed Bergeron's medical records and evaluated her tibia fracture.  Dr. Niv noted that the medical evidence showed that Bergeron's fracture was well on its way to healing nine months after the injury, and that he expected Bergeron to recuperate to her pre-injury level of functioning by one year from the date of the injury.  Dr. Niv further noted that Bergeron's other fractures were non-severe, as evidenced by the lack of treatment.

On July 26, 2007, Dr. Koval noted that Bergeron was ambulating and bearing full weight.  She complained of numbness and pain in her leg.  Dr. Koval noted that the pain seemed mostly muscular in origin, except for around the medial aspect of her wound, where there seemed to be a possible tumor growing from a nerve.  He noted excellent motion to both plantar and dorsiflexion, with some tenderness in the medial aspect of the wound to percussion.  She experienced no pain when the leg was stressed.  An x-ray showed that the fracture had healed with bridging bone present, though the fracture line was still visible.  Dr. Koval advised Bergeron to continue to bear weight as tolerated.  He suggested a revision soft tissue surgery, but Bergeron did not want to consider it at that point.

One year later, in July 2008, Bergeron's primary care physician, Dr. Glen Adams, completed a medical source statement.

Dr. Adams stated that he had seen Bergeron only three times since he became her primary care provider in May 2008, and thus could not fully assess her functional capacity. He noted, however, that she ambulated without difficulty and without assisted devices in his office. He also opined that Bergeron could perform the following activities of daily living: shopping, traveling without a companion, ambulating without assistance, using standard public transportation, preparing simple meals, feeding herself, caring for her personal hygiene, and handling paper/files.

On July 10, 2008, Bergeron broke her controlled substance agreement with the Dartmouth-Hitchcock Medical Center, as evidenced by cocaine in her urine. She was on a tapering dose of methadone at that time. On exam, her gait was normal. It was noted that she was taking care of her grandmother.

On September 19, 2008, Bergeron sought treatment at the Coos County Family Health Services, complaining that she felt weak and dizzy. She also reported back and right leg pain. Results of neurological and psychological objective exams were normal. Bergeron was informed that the facility could not provide treatment with controlled substances until Bergeron cancelled her controlled substance agreement with the Dartmouth-Hitchcock Medical Center.

On November 5, an x-ray of Bergeron's right leg showed old healed fractures of the right tibia and fibula and moderate soft tissue deformity. Dr. Paul Kamins noted that Bergeron's right tibia fracture was fully healed and looked very solid. He also noted that when Bergeron found out that the x-rays of her leg showed normal results, she immediately turned her attention to her lower back pain. A week later, Bergeron reported ongoing pain and weakness in her leg. She ambulated on her own, however, with no gait disturbance.

On February 4, 2009, Bergeron reported chronic leg and back pain to Dr. Adams. She complained that her pain was worse when she went "snow machining." On exam, she had a normal gait. Her medications were continued.

On February 8, 2010, Bergeron was examined by Dr. Gary P. Francke regarding her leg and back pain. On exam, Bergeron was in no active distress or obvious pain, stood normally, had normal sitting posture, and was able to ambulate in the exam room. Slight weakness of the right calf muscle was noted. Bergeron displayed a full range of motion in her spine, though mild soreness was noted with palpation to the back. Bergeron was also able to bend over and touch her toes and to demonstrate full flexion, extension, tilling, and twisting of the spine without any apparent discomfort. Dr. Francke opined that Bergeron had good function in her right leg and back and that

she had the ability to do basic work-related activities such as sitting, standing, walking, lifting, carrying, and bending.

On February 23, 2010, state agency physician Dr. Jonathan Jaffe reviewed Bergeron's medical records and evaluated her tibia fracture and chronic lower back pain.  Dr. Jaffe opined that Bergeron could lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and engage in unlimited pushing and pulling.  He further opined that Bergeron could climb, balance, stoop, kneel, crouch, and crawl only occasionally.

On April 2, 2010, Bergeron presented to the Dartmouth-Hitchcock Spine Center at Dr. Ford's request.  On exam, Bergeron ambulated with a mild limp on her right side.  She displayed lumbar pain with palpation.  From a standing position, Bergeron could flex forward from her waist to her calf, though the movement increased her lower back pain.  Bergeron also had back pain with extension.  Decreased sensation in her right lateral calf was noted, and the straight-leg-raise test resulted in pain in her posterior calf.  It was noted that Bergeron was not a surgical candidate.

On April 30, Bergeron had an appointment with Dr. Ford regarding her chronic pain syndrome.  She reported that she felt

great and that her pain, though present, was controlled.  At a
follow-up visit on May 27, Bergeron displayed a normal gait.

On September 17, 2010, Dr. Ford completed a Lumbar Spine
RFC Questionnaire.  Dr. Ford noted that Bergeron suffered from
chronic back and lower right extremity pain that caused reduced
range of motion, abnormal gait, sensory loss, lower back
tenderness, and right lower extremity weakness.  Dr. Ford stated
that emotional factors contributed to the severity of Bergeron's
impairments and that her symptoms frequently interfered with
concentration and attention.  Dr. Ford opined that Bergeron
could only walk one block without rest or severe pain; could
sit, stand, or walk for about two hours total in an eight-hour
workday; would require an at-will sit/stand option; would need
to sit with her legs elevated throughout the day; would need
unscheduled breaks every one-to-two hours; could never lift ten
pounds or more; could only occasionally lift less than ten
pounds; could never crouch, squat, or climb ladders; and could
rarely twist, stoop, or climb stairs.  He also opined that
Bergeron would miss more than four days of work per month due to
her impairments, which he noted had existed since June 1, 2006.

## II.  <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), I am authorized to review the
pleadings submitted by the parties and the transcript of the

administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  My review is limited to determining whether the ALJ used "the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference as long as they are supported by substantial evidence.  Id. Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion." Id. at 770.

Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence on the record. Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not the court, to resolve conflicts in the evidence.  Id.

14

The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  The applicant bears the burden, through the first four steps, of proving that his impairments preclude him from working. Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  At the fifth step, the ALJ determines whether work that the claimant can do, despite his impairments, exists in significant numbers in the national economy and must produce substantial evidence to support that finding. Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

### III.  ANALYSIS

Bergeron moves to reverse and remand the Commissioner's decision denying her disability claims on three grounds.  First, she argues that the ALJ's RFC assessment is not supported by substantial evidence in the record.  Second, she contends that the ALJ erred by determining an RFC that deviated from the state agency consultant's RFC without reference to his assessment. Lastly, she appears to argue that the ALJ gave improper weight to the opinion of Dr. Ford, her treating provider.  I address each challenge below.

### A.   The ALJ's RFC Assessment

The ALJ determined that Bergeron was capable of sedentary work involving only occasional climbing, balancing, stooping,

kneeling, crouching, or crawling.  Bergeron argues that the ALJ's RFC assessment is not supported by the record.  I disagree.

Determination of a claimant's RFC is an administrative decision reserved for the Commissioner.  See 20 C.F.R. § 404.1527(d); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). Bergeron is correct that no medical opinion in the record exactly mirrors the ALJ's RFC assessment.  She fails to recognize, however, that an ALJ is entitled to "piece together the relevant medical facts from the findings and opinions of multiple physicians." Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987).  Social Security regulations make it clear that an RFC assessment need not be based solely on medical opinions in the record; indeed, the ALJ must consider "all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3); see SSR 96-5p, 1996 WL 374183, at *4 ("Even though the adjudicator's RFC assessment may adopt the opinions in a medical source statement, they are not the same thing: A medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her

impairment(s)."). As long as the ALJ does not overstep the bounds of lay competence, she can "render[] common-sense judgments about functional capacity based on medical findings." Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990). Here, ample evidence in the record supports the ALJ's conclusion that Bergeron was capable of sedentary work.

The ALJ gave significant weight to the opinion of Dr. Francke, the orthopedic consultant who examined Bergeron. Dr. Francke opined that Bergeron had good function in her right leg and back and that she had the ability to do basic work-related activities such as sitting, standing, walking, lifting, carrying, and bending. Dr. Francke based his opinion on clinical findings and observations, including that Bergeron was in no active distress or obvious pain, stood normally, had normal sitting posture, was able to ambulate in the exam room, demonstrated only slight weakness of the right calf muscle and mild soreness with palpation to the back, and displayed a full range of motion in her spine without any apparent discomfort.

Bergeron faults the ALJ for relying upon Dr. Francke's opinion because Dr. Francke did not articulate his findings in specific functional terms. Even so, the ALJ was justified in treating Dr. Francke's opinion as evidence for the conclusion that Bergeron retained the capacity to do sedentary work. The

regulations define sedentary work as work performed primarily in a seated position while lifting no more than ten pounds, with occasional walking and standing.  20 C.F.R. § 404.1567(a). Although Dr. Francke did not indicate whether Bergeron could perform such work for eight hours at a time, his opinion that she could engage in work activities involving sitting, standing, walking, lifting, carrying, and bending is indicative of her ability to do sedentary work.  Accordingly, the ALJ was entitled to conclude that Dr. Francke's observations and opinion supported her RFC assessment.

I need not decide whether Dr. Francke's opinion was sufficient evidence of Bergeron's ability to engage in sedentary work, as Bergeron urges, because the ALJ did not rely solely upon that opinion in assessing Bergeron's RFC.  She also considered Bergeron's treatment records indicating that she made a steady progress toward recovery.  Specifically, the ALJ cited records indicating that as of July 2007, Bergeron's tibia fracture had healed and she was able to ambulate, stand, squat, jump up and down, and bear full weight on her right leg with minimal pain.  Contrary to Bergeron's suggestion, the ALJ's consideration of the medical evidence did not amount to interpretation of raw data from the medical record.  It was reasonable for the ALJ to make a common-sense determination as to Bergeron's RFC based on relatively normal x-ray results and

physical examinations.  See Gordils, 921 F.2d at 329 ("[I]f the only medical findings in the record suggested that a claimant exhibited little in the way of physical impairments, but nowhere in the record did any physician state in functional terms that the claimant had the exertional capacity to meet the requirements of sedentary work, the ALJ would be permitted to reach that functional conclusion himself."); Laflamme v. Comm'r of Soc. Sec., 07-CV-122-PB, 2007 WL 4208550, at *5 (D.N.H. Nov. 27, 2007) ("Because the medical evidence in the record demonstrates relatively little physical impairment, the ALJ did not err by drawing his own conclusion about how [the claimant's] medical impairments impact her functional capacity.").

Lastly, the ALJ considered Bergeron's testimony that was consistent with the assessment that she retained the RFC for sedentary work.  Specifically, the ALJ noted that Bergeron admitted that she had performed work in September 2007 involving lifting a man who weighed 150 pounds.  Although Bergeron resigned from the position due to pain in her leg, the ALJ reasonably concluded that "the fact that she was able to perform such physically demanding tasks, even for a short time, shows that she retains some ability to perform less physically demanding work."  Tr. 419.  In fact, Bergeron admitted in her testimony that she could perform secretarial work but complained that she could not find a position in her geographical area.

The ALJ was permitted to consider Bergeron's statement in assessing her RFC.  See Graham v. Barnhart, 02-CV-243-PB, 2006 WL 1236837, at *7 (D.N.H. May 9, 2006) ("[The claimant's] testimony that she cared for her granddaughter several days a week supports [the ALJ's] determination that she retained the RFC to stand or walk for six hours in an eight-hour day.").

Because Dr. Francke's opinion, medical evidence, and Bergeron's own statement about her functional abilities support the ALJ's RFC assessment, the ALJ's finding that Bergeron could perform sedentary work is supported by substantial evidence.

**B.    The ALJ's Failure to Discuss Dr. Jaffe's Opinion**

Bergeron also argues that the ALJ erroneously failed to indicate that she had considered the opinion of Dr. Jaffe, a state agency consultant who completed an RFC assessment based on a review of Bergeron's medical records.  Dr. Jaffe opined that Bergeron was capable of light work with occasional postural limitations.

Bergeron is correct that an ALJ "must consider and evaluate any assessment of the [claimant's] RFC by a State Agency medical or psychological consultant."  SSR 96-6p, 1996 WL 374180, at *4 (July 2, 1996).  Here, the ALJ failed to indicate that she considered Dr. Jaffe's RFC assessment, as she was required to do.  An ALJ's error, however, does not warrant a remand "if it will amount to no more than an empty exercise."  Ward v. Comm'r

of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000).  Because Dr.
Jaffe opined that Bergeron was not disabled, the outcome of the
ALJ's disability determination would have been the same even if
the ALJ had afforded his opinion significant weight.  In fact,
the only difference would have been a finding that Bergeron was
capable of a greater range of work activity than the ALJ
assessed.  Accordingly, no actual harm stemmed from the ALJ's
failure to consider Dr. Jaffe's opinion and a remand is not
warranted on this basis.[3]

C.    **The ALJ's Treatment of Dr. Ford's Opinion**

      Although Bergeron does not fully develop the argument, she
also contends that the ALJ improperly rejected the opinion of
Dr. Ford, her treating provider.  Dr. Ford opined that Bergeron
could lift less than ten pounds only occasionally, could sit for
about two hours in an eight-hour workday, and could stand or
walk for two hours in an eight-hour workday.  The ALJ gave no
weight to Dr. Ford's opinion.  Substantial evidence supports the
ALJ's decision.

---

[3] Bergeron's reliance on Fortin v. Astrue, No. 10-cv-441-JL, 2011
WL 2295171 (D.N.H. May 18, 2011), is misguided.  In Fortin, the
ALJ's consideration of the unaddressed state agency opinion
could have changed the outcome of the disability determination
because the consultant opined that the claimant's functional
abilities were more restricted than the ALJ had found.  See id.
Accordingly, a remand of the case to the Commissioner was not
necessarily an empty exercise.  See id.

A treatment provider's opinion must be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).  The ALJ "may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors." Coggon v. Barnhart, 354 F.Supp.2d 40, 52 (D. Mass. 2005) (internal quotation marks and citations omitted); see 20 C.F.R. § 404.1527(c)(2).

When a treating physician's opinion is not entitled to controlling weight, the ALJ determines the amount of weight based on factors that include the nature and extent of the physician's relationship with the applicant, whether the physician provided evidence in support of the opinion, whether the opinion is consistent with the record as a whole, and whether the physician is a specialist in the field. 20 C.F.R. § 404.1527(c)(1-6).  In addition, the ALJ must give "good" reasons for the weight given to treating physician's opinions. Id.; see also Soto-Cedeño v. Astrue, 380 Fed. Appx. 1, 4 (1st Cir. 2010).

Here, the ALJ gave no weight to Dr. Ford's opinion that Bergeron was limited to a less than sedentary RFC.  The ALJ reasoned that Dr. Ford's assessment was inconsistent with

Bergeron's own statements about her functional capacity and Dr. Francke's opinion.  Specifically, the ALJ noted that Dr. Ford opined that Bergeron was only capable of occasionally lifting less than ten pounds, whereas the record demonstrated that Bergeron was "capable of far more," given that for a short period of time she was able to do work involving lifting a man who weighed 150 pounds.  As the ALJ noted, moreover, Dr. Ford's assessment was inconsistent with Dr. Francke's observations and relatively normal exam findings.  Accordingly, the ALJ was justified in giving no weight to Dr. Ford's opinion.

## IV.  **CONCLUSION**

For the foregoing reasons, Bergeron's motion to reverse the decision of the Commissioner (Doc. No. 7) is denied.  The Commissioner's motion to affirm (Doc. No. 8) is granted.  The clerk shall enter judgment accordingly and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

June 7, 2012

cc:  D. Lance Tillinghast, Esq.
     Gretchen Leah Witt, AUSA